UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **COUVILLION GROUP, LLC** | **CIVIL ACTION** |
| **VERSUS** | **NO. 19-676-WBV-KWR** |
| **QUALITY FIRST CONSTRUCTION, LLC** | **SECTION: D (4)** |

## AMENDED FINDINGS OF FACT and CONCLUSIONS OF LAW

This matter was tried before the Court without a jury on November 18, 2019. During the Final Pretrial Conference held on November 5, 2019, the Court orally adopted the Joint Pre-Trial Order.[1] The Court carefully considered the testimony of all of the witnesses and the exhibits entered into evidence during the trial, as well as the record, and issued its Findings of Facts and Conclusion of Law pursuant to Federal Rule of Civil Procedure 52 on September 11, 2020.[2] In the Court's Conclusions of Law, the Court concluded that the prevailing party, Couvillion Group, LLC, was entitled to reasonable attorney's fees under Louisiana's Open Account Statute, La. R.S. 9:2781(A), but ordered Couvillion Group, LLC to file a separate motion for attorney's fees.[3] Couvillion Group, LLC timely-filed a motion for attorney's fees on September 18, 2020, which remains pending before the Court.[4] Due to the outstanding issue of attorney's fees, the Court has not yet entered a final judgment in this matter.

---

[1] R. Docs. 19, 23.
[2] R. Doc. 39.
[3] *Id*. at pp. 15-17.
[4] R. Doc. 43.

Although not raised by the parties in a motion, the Court, upon further review, finds that Couvillion Group, LLC is not entitled to attorney's fees. In the Findings of Fact and Conclusions of law, the Court determined, and neither party disputes, that the Court has subject matter jurisdiction over this case pursuant to 28 U.S.C. § 1333, as the claims concern a maritime contract and arise under the general maritime law of the United States.[5] While neither party briefed the issue to the Court,[6] clear Fifth Circuit authority states that, "the general rule of maritime law that parties bear their own costs, coupled with the need for uniformity in federal maritime law, precludes the application of state attorneys' fee statutes . . . to maritime contract disputes."[7] Couvillion Group, LLC has not put forth any reason to reach a different result in this case. As there has been no entry of a final judgment in this matter, pursuant to Federal Rule of Civil Procedure 54(b), the Court issues the following Amended Findings of Fact and Conclusions of Law to correct a legal determination made regarding attorney's fees. To the extent that any finding of fact may be construed as a conclusion of law, the Court hereby adopts it as such. To the extent that any conclusion of law may be construed as a finding of fact, the Court adopts it as such.

## Findings of Fact

1. Plaintiff, Couvillion Group, LLC ("Couvillion") is a limited liability company organized under the laws of the States of Louisiana with its domicile address in Plaquemines Parish, Louisiana.

---

[5] R. Doc. 39 at p. 9; R. Doc. 19 at p. 2; R. Doc. 31 at p. 8, ¶ 48; R. Doc. 33 at p. 4, ¶ 1.
[6] *See*, R. Docs. 31 & 33.
[7] *Texas A&M Research Foundation v. Magna Transp., Inc.*, 338 F.3d 394, 406 (5th Cir. 2003).

2. Timothy Couvillion is the CEO and one of the owners of Couvillion Group, LLC.

3. Okbel Guillen is the office manager and accounts receivable person for Couvillion.

4. Couvillion Group, LLC is a Louisiana contractor providing various marine services, including but not limited to marine construction, salvage, repair and maintenance in the marine industry.

5. Defendant, Quality First Construction LLC d/b/a Quality First Marine ("QFM") is a Louisiana limited liability company headquartered in St. Tammany Parish, Louisiana.

6. At the time of the 2017 project at issue in this case, Darryl Couvillion was an owner and the Operations Manager of QFM.[8]

7. Darryl Couvillion is Timothy Couvillion's brother.

8. As the Operations Manager, Darryl Couvillion had the authority to negotiate and bind contracts on behalf of QFM.

9. The President and majority owner of QFM at the time of the underlying project was Christina Couvillion, the former spouse of Darryl Couvillion.

10. Michael Ashcraft was QFM's project manager for the project.

11. QFM provides marine construction, marine transportation/logistics and other services to the marine industry.

---

[8] In October 2017, Darryl Couvillion was terminated from QFM by his ex-wife and majority QFM owner, Christina Couvillion.

12. At the time of the 2017 project, Couvillion and QFM had an existing work relationship and had previously worked together on many projects for several years.

13. During those prior projects, Darryl Couvillion of QFM gave verbal authorizations for work to be performed by Couvillion, which work was subsequently paid by QFM.

14. In January 2017, QFM contracted with the United States Army Corps of Engineers ("USACE") for a project known as the Caernarvon Sector Gate Project ("the 2017 Project") in St. Bernard Parish, Louisiana.

15. The 2017 Project involved the relocation of a hydraulic steel flood control gate along the Mississippi River.

16. Couvillion submitted a Lump Sum Proposal/Day Rate Proposal to QFM, wherein Couvillion proposed that it could provide equipment/personnel to QFM for the 2017 Project for a lump sum of $164,735.[9]

17. QFM accepted Couvillion's proposal.

18. In order to perform this project, on or about January 24, 2017, QFM entered into a Subcontract Agreement with Couvillion, wherein Couvillion would, "Furnish all labor, equipment, supplies and material for performing all operations necessary, for installing, dewatering, monitoring, rewatering and removing dewatering components for the Hydraulic Steel Structure."[10]

---

[9] Trial Exhibit 3.
[10] Trial Exhibit 1, Schedule A.

19. Paragraph 2 of the subcontract states: "*Price*. Contractor [QFM] shall pay Subcontractor [Couvillion] for the due and full performance of the Work based on the amounts reflected in Schedule C ("The Price"). Any variations of the price must be based on mutual written consent of the parties."[11]

20. Schedule C, attached to the Subcontract, reflects the price of $164,735.

21. The $164,735 price was the same price in Couvillion's Lump Sum Proposal initially provided to QFM.[12]

22. Paragraph 8 of the Subcontract provides that:

> Contractor [QFM] may . . . order extra or additional work, deletions, or other modifications to the Work, such changes to be effective only upon written order of Contractor. Any adjustment to the Price or to the time for completion of the Work shall be made in accordance with the applicable provisions of the Contract, or in the absence of such provisions, on an agreed or equitable basis. Notwithstanding any inability to agree upon any adjustment or the basis for an adjustment, Subcontractor shall, if desired by Contractor, nonetheless proceed in accordance with the order, and the Price and time of completion shall be adjusted in accordance with the foregoing."[13]

23. QFM and Couvillion also entered into a written agreement for the use of a houseboat to support personnel working on the 2017 Project.

24. Under the "On Hire/Time Charter Agreement" ("Charter Agreement"), Couvillion agreed to provide the houseboat to QFM for a flat rate of $72,508 to house and feed workers on the 2017 Project, including Couvillion's workers.[14]

---

[11] Trial Exhibit 1.
[12] Trial Exhibit 3.
[13] Trial Exhibit 1.
[14] Trial Exhibit 2.

25. The Charter Agreement provides a start date of January 24, 2017.
26. Couvillion and QFM intended for the houseboat to be used for the duration of the 2017 Project, as agreed to in the Subcontract.
27. Couvillion was paid the $72,508 for the houseboat pursuant to the Charter Agreement.
28. The 2017 Project experienced some delays associated with the inspections of welds on the flood gate and its components.
29. According to the parties, these delays were caused by the USACE and Crescent Coating and Services, another subcontractor on the 2017 Project.
30. QFM requested that Couvillion keep the houseboat on site for QFM's use during the period of delay.
31. In written communication, QFM requested that Couvillion provide the day rate for using the houseboat during the period of delay.
32. Couvillion provided QFM a day rate of $1,500 for the additional days that QFM used the houseboat.
33. QFM requested that Couvillion provide an invoice for the use of the houseboat during the period of delay.
34. On May 31, 2017, Couvillion submitted an invoice to QFM in the amount of $37,500 which reflected the houseboat rental for an additional 25 days due to the delay.[15]
35. Couvillion provided the houseboat for QFM's use for the additional 25 days.

---

[15] Trial Exhibit 4.

36. QFM submitted Couvillion's houseboat pricing to the USACE and received payment from the USACE for the use of the houseboat.

37. QFM has not paid Couvillion for the use of the houseboat during the additional 25 days.

38. Couvillion has not been paid by any party for the use of the houseboat during the standby delay period.

39. A third company, Crescent Coating and Services ("CCS"), was responsible for scaffolding and sand removal for the 2017 Project.

40. CCS was the blasting and painting subcontractor to QFM.

41. Couvillion performed all of the work requested by QFM for the 2017 Project pursuant to the Subcontract.

42. QFM requested that Couvillion provide additional equipment and services to address the delays caused by the USACE and CCS.

43. At the request of Darryl Couvillion, QFM's owner and Operations Manager, Couvillion provided additional scaffolding services, work and labor to CCS. This additional work was outside of the Subcontract agreed to by the parties.

44. Couvillion performed the additional work requested by QFM, which included the use of a crane for scaffolding work.

45. Couvillion submitted an invoice in the amount of $22,108 to QFM for the costs associated with the equipment and services provided to CCS.[16]

46. QFM failed to pay Couvillion any portion of the $22,108 invoice.

---

[16] Trial Exhibit 10.

47. At the request of Darryl Couvillion, owner and Operations Manager of QFM, Couvillion also worked an extra 62.5 hours assisting CCS with the handling of sand and removal of scaffolding. This additional work was outside of the Subcontract agreed to by the parties.

48. Couvillion incurred costs of $25,000 for the additional hours worked assisting CCS.

49. Couvillion submitted these charges to QFM via email on June 16, 2017, which included Daily Job Logs.[17]

50. QFM failed to pay Couvillion any portion of the $25,000 for the extra work associated with assisting CCS.

51. Darryl Couvillion's testimony was particularly credible when he testified that, as owner and Operations Manager of QFM, he requested the additional work from Couvillion, Couvillion performed the work, and he accepted the work.

52. Darryl Couvillion was also credible when he testified,

> [T]here was undoubtedly consent. Whether it be in writing or not, if I give someone my word, painstakingly or not I have always abided by that when it came to my business. So was there an agreement? Yes. . . . They did the work. It doesn't matter if it is in writing. They deserve the money. So I don't know what you are getting after with that. That's—it is upsetting.[18]

53. Darryl Couvillion further testified, "Right now I'm thinking to myself, what are we doing? Are we kidding? This really is simple. We have oral conversations all the time. We agree to something and there is so many emails that follow

---

[17] Trial Exhibit 12.
[18] Draft trial testimony of Darryl Couvillion.

up confirming all these conversations. Mike [Ashcraft] and I put together." He later testified that, "They did the work. We owe them the money. Do you think I like to say that being an owner of Quality First Marine? That takes [money] out of my pocket."[19]

54. Darryl Couvillion was also credible when he testified that he advised and obtained the consent from the majority owner of QFM, Christina Couvillion, for the oral modifications of the Subcontract, testifying that, "We talked about this all the time. She was just as involved as me and Mike [Ashcraft] dealing with these modification as I was. So she knew about them. So, just like I said before, if we tell someone our word and go back and rely on this paper, that's awful."[20]

55. Prior to the 2017 Project, QFM had entered into hundreds of written contracts with subcontractors, including many with Couvillion, which it amended by subsequent oral agreements.

56. With respect to the 2017 Project, QFM asked Couvillion to assist with work that was outside the scope of work in the Subcontract, both by written and oral communication.

57. Couvillion agreed to provide the additional work and equipment requested by QFM for the 2017 Project.

58. Couvillion expended time, effort and monies performing these additional services and providing the equipment.

---

[19] *Id.*
[20] *Id.*

59. QFM benefitted from the additional services and equipment provided by Couvillion and QFM has made no payment for these services and equipment.

## Conclusions of Law

A. **Jurisdiction and Venue**

1. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1333 because this is an admiralty and maritime case within the meaning of Rule 9(h) of the Federal Rules of Civil Procedure, as the claim involves a dispute regarding a contract for marine services.

2. Venue is appropriate in the Eastern District of Louisiana.

B. **Count 1 – Breach of Maritime Contract**

1. The Subcontract at issue is a maritime contract, as a crane barge plays a substantial role in the fulfillment of the contract, and the gate work on the Caernarvon Canal facilitates activities on navigable waters. *Barrios v. Centaur,* 942 F.3d 670, 680 (5th Cir. 2019); *In re Larry Doiron*, 879. F.3d 568 (5th Cir.) (*en banc*), *cert. denied,* 138 S.Ct. 2033, 201 L.Ed.2d 280 (2018).

2. The Fifth Circuit has held that the interpretation of a maritime contract is a question of law. *Barrios*, 942 F.3d at 680 (quotation omitted).

3. When interpreting maritime contracts, federal admiralty law, rather than state law, applies. *LLOG Exploration Company, LLC v. Signet Maritime Corporation*, 673 Fed.Appx. 422, 425 (5th Cir. 2016) (quoting *International Marine, LLC v. Delta Towing, LLC*, 704 F.3d 350, 354 (5th Cir. 2013)) (internal quotation marks omitted).

4. The Fifth Circuit has clarified that, "In maritime contract disputes, federal courts apply general principles of contract law. However, to the extent that it is not inconsistent with admiralty principles, state contract law may be applicable to maritime contracts." *In re Tasch, Inc.*, 2002 WL 1973464, at *2, 46 Fed.Appx. 731 (5th Cir. 2002) (citations omitted).

5. According to the Fifth Circuit, "A maritime contract . . . whether governed by federal maritime or Louisiana law, should be read as a whole and its words given their plain meaning unless the provision is ambiguous." *LLOG Exploration Company, LLC*, 673 Fed.Appx. at 425 (quoting *Weathersby v. Conoco Oil Co.*, 752 F.2d 953, 955 (5th Cir. 1984)) (internal quotation marks omitted).

6. "Louisiana law requires that each provision of a contract be read in light of others so as to give each the meaning reflected by the contract as a whole." *Southwestern Eng'g Co. v. Cajun Elec. Power Co-op., Inc.*, 915 F.2d 972, 980 (5th Cir. 1990) (*citing* La. Civ. Code art. 2050).

7. Louisiana law also provides that each provision of a contract must be given a meaning that renders it, along with all other provisions, effective rather than meaningless. *See Lewis v. Hamilton*, 94-2204 (La. 4/10/95), 652 So.2d 1327, 1330 (*citing* La. Civ. Code arts. 2049-2050).

8. The Supreme Court has long-held that maritime law generally regards oral contracts as valid. *Kossick v. United Fruit Co.,* 365 U.S. 731, 734, 81 S.Ct. 886, 6 L.Ed.2d 56 (1961).

9. "It is well-settled that a plaintiff suing on a contract, whether written or oral, is required to establish the basic elements of a contract, i.e., offer, acceptance, and consideration," *In re Tasch, Inc.*, 2002 WL 1973464, at *3, 46 Fed.Appx. 731 (5th Cir. 2002) (citation omitted).

10. A written contract can be modified by oral contracts and by the conduct of the parties, even when the written contract contains a provision that modifications must be in writing. *See In re Tasch, Inc.*, 2002 WL 1973464, 46 Fed.Appx. 731 (finding that a subsequent oral agreement to perform additional work valid even though the contract entered into between the parties provided that any alterations must be in writing.); *Taita Chem. Co., Ltd. v. Westlake Styrene Corp.*, 246 F.3d 377, 387 (5th Cir. 2001) ("Moreover, it is well established that even if the written contract contains a provision requiring that all modifications be in writing . . . either oral agreement or conduct can nonetheless prove modification."); *Lantech Const. Co., L.L.C. v. Speed*, 08-811 (La. App. 5 Cir. 5/26/09), 15 So.3d 289, 293-94 (recognizing oral modifications to a contract that required written requests for modification, but did not expressly prohibit oral modification).

11. Under Louisiana law, "The written contract can be modified through 'silence, inaction, or implication' and whether it was modified 'is a question of fact.'" *Alonso v. Westcoast Corporation*, 920 F.3d 878, 886 (5th Cir. 2019) (citing *Driver Pipeline Co. v. Cadeville Gas Storage, LLC*, 49,375 (La. App. 2 Cir. 10/1/14), 150 So.3d 492, 501).

12. In such instances, parole evidence is admissible and the party urging modification must establish that the parties mutually consented to the agreement as modified. *CNH Capital Am., LLC v. Wilmot Farming Ventures, LLC*, Civ. A. No. 07-611, 2008 WL 2386166, at *3 (W.D. La. June 11, 2008) (quoting *Taita Chem. Co. v. Westlake Styrene Corp.*, 246 F.3d 377, 387 (5th Cir. 2001)). "This consent may be made orally, be manifested by a writing, or be manifested by 'action or inaction that under the circumstances is clearly indicative of consent.'" *CNH Capital Am., LLC*, Civ. A. No. 07-611, 2008 WL 2386166 at *3 (quoting *Taita Chem. Co.*, 246 F.3d at 386). "Thus, even if a contract requires modifications to be signed by the parties, Louisiana courts will recognize modifications by other means as long as the evidence is 'clearly indicative' that the parties to the contract consented to the modification." *CNH Capital Am., LLC*, Civ. A. No. 07-611, 2008 WL 2386166 at *3.

13. "It is fundamental contract law that a party that breaches a contract is liable for the damages caused by its failure to satisfy its contractual obligations." *Tidewater Marine, Inc. v. Sanco Int'l, Inc.*, 113 F. Supp. 2d 987, 999 (E.D. La. 2000) (*citing Ogea v. Loffland Bros. Co., Inc.*, 622 F.2d 186, 189 (5th Cir. 1980)).

14. The Court finds that: (1) there was a valid written contract between Couvillion and QFM; (2) that written contract was modified by an oral contract between Couvillion and QFM; (3) Couvillion fully performed under the contract; (4) QFM accepted and benefitted from the services and equipment provided by Couvillion; (5) QFM's non-payment for the services and equipment provided by

Couvillion constitutes a breach of the terms of the contract; and (6) Couvillion sustained damages as a result of QFM's breach of the contract.

15. "As a general rule, prejudgment interest should be awarded in admiralty cases – not as a penalty, but as compensation for the use of funds to which the claimant was rightfully entitled." *Ziegler v. Subalipack (M) SDN BHD*, Civ. A. No. H-16-2598, 2018 WL 2933349, at *10 (S.D. Tex. June 12, 2018) (quoting *Noritake Co. v. M/V Hellenic Champion*, 627 F.2d 724, 728 (5th Cir. 1980)).

16. The Fifth Circuit has recognized the "bedrock premise" that an award for prejudgment interest in actions under general maritime law is the rule rather than the exception, and that prejudgment interest must be awarded unless unusual circumstances make an award inequitable. *Ryan Walsh Stevedoring Co., Inc. v. James Marine Servs., Inc.*, 792 F.2d 489, 492 (5th Cir. 1986).

17. Admiralty courts have broad discretion in setting the prejudgment interest rate. *Platoro Ltd., Inc. v. Unidentified Remains of a Vessel, Her Cargo, Apparel, Tackle, & Furniture, in a Cause of Salvage, Civil & Mar.*, 695 F.2d 893, 907 (5th Cir. 1983) (particular rate lies within the district court's discretion after it evaluates the circumstances of the case); *Todd Shipyards Corp. v. Auto Transp., S.A.*, 763 F.2d 745, 753 (5th Cir. 1985) (affirming use of state interest rate compounded daily to account for uncommonly high rate of return during the applicable period); *see also Reeled Tubing, Inc. v. M/V Chad G*, 794 F.2d 1026, 1029 (5th Cir. 1986) (affirming prejudgment interest at federal statutory post-judgment interest rate); *Complaint of M/V Vulcan*, 553

F.2d 489, 491 (5th Cir. 1977) (affirming award of interest at rate equivalent to injured party's actual cost of borrowing).

18. This Court will assess prejudgment interest at the legal rate established under 28 U.S.C. § 1961 at the time of final judgment.  *See In re M/V Nicole Trahan*, 10 F.3d 1190, 1196-97 (5th Cir. 1994) (affirming award of prejudgment interest at federal rate when there was no evidence to support a different rate).

19. The Court finds that Couvillion is entitled to an award of prejudgment interest as provided by law.

20. Accordingly, prejudgment interest shall be calculated from January 29, 2019, the date Couvillion filed its Complaint,[21] through the date of the entry of judgment, at a rate equal to the weekly average 1-year constant maturity Treasury yield, as published by the Board of Governors of the Federal Reserve System, for the calendar week preceding the date of the judgment.  28 U.S.C. § 1961(a); See *Reeled Tubing, Inc. v. M/V Chad G*, 794 F.2d 1026, 1029 (5th Cir. 1986) (citing *Howell v. Marmpegaso Compania Naviera, S.A.*, 578 F.2d 86 (5th Cir. 1978) (recognizing the usual rule requiring an award of prejudgment interest from the date of loss, but that there are circumstances when a trial court can exercise its discretion to award prejudgment interest only from the date of judicial demand).

21. Under 28 U.S.C. § 1961(a), post-judgment interest "shall be allowed on any money judgment in a civil case recovered in a district court. . . . Such interest

---

[21] R. Doc. 1.

shall be calculated from the date of the entry of the judgment . . . ." Generally, "[C]osts—other than attorney's fees—should be allowed to the prevailing party." Fed. R. Civ. P. 54(d).

22. The Court finds that Couvillion is entitled to damages in the amount of $84,608, plus prejudgment and post-judgment interest calculated pursuant to 28 U.S.C. § 1961(a).

## C. Count 2 – Relief Under Louisiana's Open Account Statute, La. R.S. 9:2781

1. "Reasonable attorney fees may be recovered if an open account existed and plaintiffs complied with the requirements of the applicable statute." *Advance Polybag, Inc. v. LTD Packaging Corp.*, Civ. A. No. 91-2148, 1992 WL 125316 (E.D. La. June 3, 1992).

2. An "open account" includes "any account for which a part or all of the balance is past due, whether or not the account reflects one or more transactions and whether or not at the time of contracting the parties expected future transactions." La. R.S. 9:2781(D).

3. Louisiana Revised Statute 9:2781, entitled, "Open accounts; attorney fees; professional fees; open account owed to the state," also provides, in pertinent part, that:

> A. When any person fails to pay an open account within thirty days after the claimant sends written demand therefor correctly setting forth the amount owed, that person shall be liable to the claimant for reasonable attorney fees for the prosecution and collection of such claim when judgment on the claim is rendered in favor of the claimant. Citation and service of a petition shall be deemed written demand for the purpose of this Section. If

> the claimant and his attorney have expressly agreed that the debtor shall be liable for the claimant's attorney fees in a fixed or determinable amount, the claimant is entitled to that amount when judgment on the claim is rendered in favor of the claimant. Receipt of written demand by the person is not required.

4. In accordance with La. R.S. 9:2781(A), more than thirty (30) days have passed since QFM's receipt of Couvillion's written demands, setting forth the amounts owed by QFM on the open account, and no amount of the outstanding debt has been paid.

5. The Court finds that Couvillion has strictly complied with the provisions of La. R.S. 9:2781(A), in that the demand letters set forth the correct amount owed and included invoices documenting the delinquent transactions. *Advance Polybag, Inc. v. LTD Packaging Corp.*, Civ. A. No. 91-2148, at *3, 1992 WL 125316 (E.D. La. June 3, 1992).

6. Couvillion, however, mistakenly argues that it is entitled to attorney's fees under the Louisiana Open Account Statute, La. R.S. 9:2781, in this maritime case. The Fifth Circuit has held that, "Maritime disputes generally are governed by the 'American Rule,' pursuant to which each party bears its own costs." *Texas A&M Research Foundation v. Magna Transp., Inc.*, 338 F.3d 394, 405 (quoting *Galveston County Nav. Dist. V. Hopson Towing Co.*, 92 F.3d 353, 356 (5th Cir. 1996)).

7. Fifth Circuit authority is also clear that, "the general rule of maritime law that parties bear their own costs, coupled with the need for uniformity in federal maritime law, precludes the application of state attorneys' fee statutes . . . to

maritime contract disputes." *Texas A&M Research Foundation*, 338 F.3d at 406.

8. Relying upon the foregoing Fifth Circuit authority, another Section of this Court previously determined that a party may not recover attorney's fees under Louisiana's Open Account Statute in a maritime case. *Sea Link Cargo Services Inc. v. Marine Centre Inc.*, Civ. A. No. 09-30447, 2010 WL 2294732, at *2 (E.D. La. June 9, 2010) (citing *Texas A&M Research Foundation*, 338 F.3d at 406). *See, Cheramie Marine, LLC v. Freedom Well Services, LLC*, 2015 WL 7306438, at *1 (E.D. La. Nov. 19, 2015) ("The Fifth Circuit has held that general maritime law precludes the application of state attorney's fees statutes to maritime contract disputes. Thus, under general maritime law, in the absence of a federal statute or a provision or attorney's fees in an enforceable contract, litigants must pay their own attorney's fees.") (footnotes omitted).

9. Based on the foregoing, the Court finds that Couvillion is not entitled to attorney's fees under Louisiana's Open Account Statute, La. R.S. 9:2781.

## D. Count 3 – Quantum Meruit/Unjust Enrichment

1. Under Louisiana law, five elements must be satisfied in order to establish a claim for unjust enrichment: "(1) an enrichment of the defendant, (2) an impoverishment of the plaintiff, (3) a connection between the enrichment and the impoverishment, (4) an absence of justification or cause for either the enrichment or the impoverishment, and (5) no other remedy available at law." *Aqua–Terra Constr. and Eng'g Sys., Inc. v. Oak Harbor Inv. Props., L.L.C.*, Civ.

A. Nos. 06-1864, 06-8883, 2008 WL 3539728, at *3 (E.D. La. July 31, 2008) (citations omitted).

2. The Court concludes that Couvillion cannot recover under its quantum meruit/unjust enrichment claim, since Couvillion has another remedy available to it under the law. Thus, it has not established the five factors required to prevail on an unjust enrichment claim.

### Conclusion

The Court finds that defendant, Quality First Construction LLC d/b/a Quality First Marine, is liable to plaintiff, Couvillion Group, LLC, in the full amount of $84,608, plus prejudgment interest at the rate pursuant to 28 U.S.C. 1961 from the date of filing this lawsuit, January 29, 2019, through the date of entry of the Court's final judgment, and post-judgment interest at the same rate from the date of this Court's final judgment until it is paid in full. Couvillion Group, LLC shall have five (5) business days from the date of these Amended Findings of Fact and Conclusions of Law to provide the Court with a proposed Final Judgment that is commensurate with the Court's Amended Findings of Fact and Conclusions of Law. Couvillion Group, LLC shall send the proposed Final Judgment to the Court's email address, efile-Vitter@laed.uscourts.gov.

New Orleans, Louisiana, March 8, 2021.

*Wendy B. Vitter*
**WENDY B. VITTER**
**United States District Judge**